# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

CHAD CHADWICK,                          §
                                        §
        *Plaintiff*,                    §
                                        §
v.                                      §        CIVIL ACTION H-13-2151
                                        §
CITY OF MISSOURI CITY, *et al.*,        §
                                        §
        *Defendant*.                    §

## MEMORANDUM OPINION AND ORDER

Pending before the court is a motion for summary judgment filed by defendants Matthew Newport, Kurt Maxheimer, Matthew Yount, Daniel Boykin (collectively, the "Individual Defendants") and the Cities of Sugar Land and Missouri City (Dkt. 36), a motion for summary judgment filed by the City of Stafford (Dkt. 34), and a motion to exclude plaintiff Chad Chadwick's expert filed by all defendants except the City of Stafford (Dkt. 38). Having reviewed the motions, related documents in the record, and the applicable law, the court is of the opinion that both motions for summary judgment should be GRANTED and the motion to exclude should be DENIED.

## I. BACKGROUND

This is a Civil Rights case relating to the arrest of Chadwick.

On September 27, 2011, Chadwick was supposed to give his co-worker, Geordie Varghese, a ride home from work. Dkt. 36, Ex. B. at 20. Chadwick, however, left work early—at 2:30 or 3:00—because he was upset about a conversation he had had with his wife. *Id.* at 11–12. Chadwick had recently moved to Houston, and his wife informed him that she would not be moving from San Antonio to Houston. *Id.* at 11–14. Chadwick started to drive to San Antonio, but his wife told him not to come, so he turned around and drove to his apartment in Missouri City. *Id.* at 51. When

Chadwick reached his apartment, he drank half a bottle of vodka. *Id.* at 18–21. Varghese came to Chadwick's apartment between 5:30 and 6:30 to ask Chadwick why he did not give him a ride. *Id.* at 19–20. Chadwick spoke to Varghese about his problems with his wife. *Id.* at 23–24. Chadwick was very emotional when speaking with Varghese and told Varghese that he was "done with 36 or 37 years of pain." Dkt. 36, Ex. P at 24; Dkt. 36, Ex. B at 28–29.

Varghese got upset, too, and Chadwick told him to leave. Dkt. 36, Ex. B at 29–30; Dkt. 36, Ex. P at 27. Varghese did not want to leave, so Chadwick threw his (Chadwick's) keys and phone out the door and let his dog out. Dkt. 36, Ex. B at 30; Dkt. 36, Ex. P. at 28–29. Chadwick knew that his dog would run away and that Varghese would go after the dog. Dkt. 36, Ex. B at 30. When Varghese exited the apartment to go after the dog, Chadwick locked the door so that Varghese could not come back in. *Id.* at 34. Varghese returned and knocked on the door, but Chadwick would not respond to the knocking. *Id.* Chadwick wanted to be alone. *Id.* at 30. Varghese was afraid that Chadwick, who had a 12-gauge shotgun in his apartment, was suicidal. Dkt. 36, Ex. P at 31. Varghese called 911. Dkt. 36, Ex. P at 32.

Chadwick eventually passed out on his bed. Dkt. 36, Ex. B at 34. When he woke up, he needed to throw up, so he went to the bathroom. *Id.* at 35. He was unable to throw up, but he still felt really bad, so he decided to take a shower. *Id.* at 36. He sat in the shower, letting the water run over his head, and passed out again. *Id.*

About 20 minutes after Varghese called 911, an officer from the Missouri City Police Department ("MCPD") arrived. Dkt. 36, Ex. P at 34. Varghese told the MCPD officer which

apartment Chadwick was in. *Id.* at 35. Other officers arrived and decided to call SWAT team.[1]

Dkt. 36. The SWAT team consisted of officers from municipalities in Fort Bend County. The

officers knocked on Chadwick's door, but got no response. Dkt. 36, Ex. D at 58–61. Chadwick

heard knocking when he went from his bedroom to the bathroom, but he thought it was Varghese.

Dkt. 41, Ex. D at 37. The officers next tried contacting Chadwick with a bullhorn and throwing

rocks at the door and window, but Chadwick did not respond.[2] Dkt. 36, Ex. D at 61, 69. Because

there was no response, the officers determined that Chadwick needed immediate assistance under

life-threatening conditions. *Id.* at 61. At least some of the officers also, for some reason, believed

that Chadwick had assaulted Varghese, who they thought was Chadwick's roommate. Dkt. 36, Ex.

D at 64. Officer Newport of Sugar Land Police Department ("SLPD"), however, believed that they

were dealing "strictly [with an] intoxicated suicidal subject," and Officer Matthew Yount of MCPD

simply knew that Chadwick's friend was concerned that Chadwick was going to kill himself. Dkt.

41, Ex. C at 113 (Newport); Dkt. 36, Ex. F at 21 (Yount).

The officers started evacuating people from the building. Dkt. 36, Ex. D at 60. They initially

wanted to use a robot to breach Chadwick's door, but were unable to do so because the robot was

not charged. *Id.* at 70–71. They obtained an order to intercept Chadwick's communications from

the 434th Judicial District Court of Fort Bend County at 11:00 p.m.[3] Dkt. 41, Ex. G. At around

---

[1] The formal name of the SWAT team is the East Fort Bend Regional SWAT Team. Dkt. 36, Ex. D at 10.

[2] It is unclear whether the bullhorn (or load hailer) was working or used correctly. *Id.* at 73; Dkt. 41 at 10.

[3] Detective Moats of MCPD obtained the order, which indicates that Moats stated that "one or more individuals were being held against their will and whose lives were put in danger by one or more suspects." Dkt. 41, Ex. G. Chadwick contends that this order was obtained through false

midnight, they breached the door.  *Id.* at 78, 82.  They threw a throw phone into Chadwick's apartment to try to communicate with him that way, but the throw phone either did not ring very loudly or there was some other issue with it.  *Id.* at 72–73.  Chadwick did not answer the phone.

The officers entered the apartment, and Sergeant Kurt Maxheimer of MCPD states that he could see into the open bathroom door.  *Id.*  The officers used a pole camera to observe Chadwick in the bathroom, and it is unclear whether Maxheimer initially saw Chadwick through the camera or in person.  *Id.*  Chadwick was leaning forward, motionless.  *Id.*  The shower was running.  *Id.*  Maxheimer claims that he saw red on Chadwick, which in hindsight he believes was a tattoo or the shower curtain.  *Id.* at 81.  At the time, though, he thought it was blood.  Dkt. 36, Ex. D at 81.  Newport, who saw Chadwick through the pole camera, also thought there was blood on Chadwick's arm.[4]  Dkt. 36, Ex. E at 85.

The officers called out to Chadwick and asked to see his hands.  *Id.*; Dkt. 41, Ex. B at 49.  At first Chadwick wasn't moving, but at one point he said, "I'm taking a shower."  Dkt. 36, Ex. E at 86; Dkt. 36, Ex. I at 000091.  All of a sudden, Chadwick turned around and, according to Maxheimer, said, "You want to see my hands, motherfucker?"  Dkt. 36, Ex. D at 88.  Yount recalls Chadwick saying, "You want to see my hands, I'll show you my hands."  Dkt. 41, Ex. B at 49.  Chadwick claims he heard someone say, "let me see your hands," and he put his hands up.  Dkt. 41, Ex. D at 40.  Maxheimer states that Chadwick stood up at this point.  Dkt. 36, Ex. D at 88–89.  Yount testified that Chadwick never stood up, but that as soon as Chadwick made the statement about his hands, he pivoted and took a professional-looking shooting stance.  Dkt. 41, Ex. B at 50.

---

allegations of probable cause.  Dkt. 41.

[4]  The tattoo on Chadwick's left arm is actually black.  Dkt 41, Ex. J.

Newport testified that Chadwick swivelled around on his hips inside the tub. Dkt. 36, Ex. E at 89.

Yount, Maxheimer, and Newport all agree that there was a black object in Chadwick's hand.[5] Dkt. 36, Ex. D at 90; Dkt. 36, Ex. E at 89; Dkt. 36, Ex. F at 30.

As soon as Newport saw the black object, he states that he believed that he and the team were in danger, and he therefore fired a non-lethal round toward Chadwick, which struck Chadwick in his right bicep.[6] Dkt. 36, Ex. E at 89; Dkt. 36, Ex. I at 000091. Maxheimer heard the shot but did not see where it came from, and one of the officers said, "He just shot at us." Dkt. 36, Ex. D at 90. Newport pulled back, set his weapon aside, and stated, "He's got a gun." Dkt. 36, Ex. E at 90, 92. Everyone pulled back to points of cover. *Id.* at 92.

Maxheimer gave an order to throw a distraction device (flash bang grenade) into the bathroom. *Id.* at 93; Dkt. 36, Ex. I at 000091. Newport pulled a pin on a flash bang and threw it into the bathroom. Dkt. 36, Ex. E at 93–94. Newport states that the flash bang grenade landed between the tub and the toilet, and it smoked up the room to where the visibility was initially zero. *Id.* at 94, 96. Three to five seconds later, it cleared enough to where the officers could see Chadwick. *Id.* According to Newport, Chadwick was standing in the corner and his hands were empty. *Id.* Yount recalls that Chadwick was standing naked in the bathtub with his fists balled up. Dkt. 36, Ex. F at 55–56.

Yount, Newport, and Boykin entered the bathroom and used a shield to pin Chadwick against the wall. Dkt. 36, Ex. E at 97. Newport noted that they used the shield because Chadwick was "an

---

[5] It was later determined that the item in Chadwick's hand was a black Axe shampoo or body wash bottle. Dkt. 36, Ex. D at 93.

[6] Newport had a less lethal weapon and was being covered by another officer who had a lethal weapon (a .40 millimeter). Dkt. 36, Ex. E at 86.

extremely large individual who's obviously very irate and aggressive at this moment in time." *Id.* at 98. Chadwick claims that he was struck in the face with the shield as well as by the officers' fists. Dkt. 36, Ex. B at 45. Chadwick then, according to Newport and Yount, began throwing punches at officers. Dkt. 36, Ex. E at 99; Ex. F at 58. Chadwick asserts that he "was still trying to comprehend what's going on. [He] just did not understand why this was happening in [his] shower. It was very surreal." Dkt. 36, Ex. B. at 48.

Newport called for Officer Danny Boykin of the SLPD to deploy the taser. Dkt. 36, Ex. E at 99. Newport believed that the initial deployment did not work. *Id.* at 100. Boykin then used the drive stun, which brought Chadwick slowly to the ground. *Id.* Chadwick claims he was tased twice. Dkt. 36, Ex. B at 50. There was a struggle on the ground because, according to Newport, Chadwick would not give the officers his hands to be cuffed. Dkt. 36, Ex. E at 101. "[S]everal punches were thrown both from Chadwick and as well as Officer Yount, who was being struck multiple times in the head defending himself." *Id.* Yount notes that it was "pretty chaotic in there," that "[e]veryone was struggling," and that "this hulk [Chadwick was] swinging on everyone."[7] Dkt. 36, Ex. F at 58. Chadwick states that after he was tased twice, the officers grabbed him by his right arm and genitalia and drug him out of the tub and onto the floor. Dkt. 36, Ex. B. at 50. He claims that he was being "pulled in many different directions," but his "body was completely limp . . . paralyzed." *Id.* at 50–51. Chadwick states that the officers then zip tied his hands and feet. *Id.* at 51, 53.

The officers next took Chadwick to the kitchen and replaced the zip ties with handcuffs. *Id.* at 53. They tried to get Chadwick to stand up, but he could not do so because his body was limp from the taser. *Id.* at 55–56. The officers tried to pick Chadwick up and, according to Chadwick,

---

[7] Chadwick is six-foot-five and weighs approximately 270 pounds. Dkt. 36, Ex. B at 55.

dropped him on his head.  *Id.* at 56–57.  Chadwick asserts that when he was dropped on his head, the weight of his body was on top of his head.  Dkt. 36, Ex. B at 57.  Chadwick contends that he was still at this point "trying to comprehend what was going on."  Dkt. 35, Ex. B at 58.  He asserts that he was concerned that it was a home invasion, as there had been reports of people dressed as police invading homes in the area.  *Id.* at 58.

Eventually, an EMT came to examine Chadwick, and after some time Chadwick was able to stand.  *Id.* at 60.  Somebody put clothes on Chadwick, walked him down the steps, and put him in the squad car.  *Id.* at 60–61.  Chadwick was initially taken to Fort Bend County Jail.  Dkt. 36, Ex. I.  At the jail, Chadwick was eventually taken to the infirmary after complaining about his arm and ribs and that his eyes were burning his ears were ringing.  Dkt. 36, Ex. B at 72.  He received eye drops and ear drops.  *Id.* at 73.  At some point, Chadwick went to the Sugar Land Hospital, where he told the people in the ER that he had been beaten up and that his head, eyes, ears, scrotum, and ribs hurt.  *Id.* at 72.

According to Chadwick, his apartment suffered thousands of dollars worth of damage, and Chadwick claims that he still suffers from the physical injuries caused by the defendants.  Dkt. 41.  He asserts that he has a permanent ringing in his ears due to the flash bang grenade, and that his physician said this will probably last the rest of his life.  He claims to have more numerous severe headaches than he had before the incident, and he complains that he has extreme pain in his genitalia and also needs a supplement to be able to engage in sexual relations.  Additionally, he has allegedly suffered adverse emotional impacts of the arrest and resulting publicity and has emotional and mental issues stemming from the defendants' actions.[8]  *Id.*

---

[8]  Chadwick does not cite to any evidence to support of his contentions that he suffered damages and lasting adverse physical and mental distress.  *See* Dkt. 41.

Chadwick filed suit against the Cities of Missouri City, Sugar Land, and Stafford on May 15, 2013. Dkt. 1. He asserted a claim under 42 U.S.C. § 1983 for Fourth Amendment violations, claiming that the three cities, while acting under the color of state law, failed to supervise and train their officers or were deliberately indifferent to their training, which resulted in a violation of Chadwick's constitutional right to be secure in his own home, a use of excessive force, and a false arrest. *Id.* Chadwick also asserted a claim against the three cities for malicious prosecution. *Id.*

On November 1, 2013, Chadwick amended his complaint and added the Individual Defendants. Dkt. 23. The Individual Defendants and the Cities of Missouri City and Sugar Land move for summary judgment, arguing that (1) the claims against the Individual Defendants are barred by the statute of limitations; (2) exigent circumstances and special needs authorized the Individual Defendants' actions; (3) the force used to detain Chadwick was not excessive or objectively unreasonable; (4) there was no malicious prosecution; (5) there is no evidence of an unlawful conspiracy; (6) the Cities of Missouri City and Sugar Land cannot be liable because there was no constitutional deprivation; (7) the Cities of Missouri City and Sugar Land were not deliberately indifferent to a need for constitutionally adequate police officer training; (8) the Cities of Missouri City and Sugar Land were not deliberately indifferent to the need for a constitutionally adequate police officer supervision program; (9) the Cities of Missouri City and Sugar Land did not ratify unconstitutional conduct; and (10) the Individual Defendants are protected by qualified immunity. Dkt. 37.

The City of Stafford also moves for summary judgment. Dkt. 35. With regard to the wrongful search and arrest claims under § 1983, the City of Stafford argues that no police officer from Stafford made the decision to enter Chadwick's apartment and that Stafford police officers did arrest or make

the decision to arrest Chadwick. *Id.* Stafford also argues that even if Stafford officers had made the decision to enter the apartment, the circumstances justified entry. *Id.* As far as the excessive force claim, Stafford asserts that no Stafford officer was involved in Chadwick's detention or arrest and no excessive force was used in any Stafford officer's presence. *Id.* Stafford requests summary judgment with regard to Chadwick's conspiracy theory because there are no specific facts alleged about Stafford officers. *Id.* Finally, Stafford requests summary judgment in its favor on the claim that a policy or custom deprived Chadwick of his constitutional rights because there is no indication that Stafford officers deprived Chadwick of his constitutional rights. *Id.*

Chadwick argues that the claims against the Individual Defendants are not barred by the statute of limitations because the statute of limitations should relate back to when the Individual Defendants knew or should have known that the action would be brought against them. Dkt. 41. He then claims that exigent circumstances and special needs are not applicable, as four hours had transpired without incident prior to the entry into Chadwick's home, and that was only after various tactics were utilized in an effort to make contact with Chadwick that failed. *Id.* Chadwick next asserts that there is an issue of material fact as to whether the force used was excessive. *Id.* Chadwick argues that the municipalities are liable under Section 1983 because the Individual Officers were acting in accordance with municipal policy or custom. *Id.* Chadwick asserts that the municipalities ratified the officers' conduct by not disciplining them afterwards. *Id.* Chadwick contends that the Individual Officers are not entitled to qualified immunity because they violated his clearly established constitutional rights. *Id.* As far as malicious prosecution, Chadwick argues that Officer Boykin and Officer Yount both complained an assault had been committed against them, yet these officers sustained no injuries. *Id.* Chadwick contends that the Individual Officers engaged in

a conspiracy because they had knowledge of, agreed to, and intended a common objective or course of action that resulted in damage to Chadwick. *Id.*

Chadwick relies on the testimony of his expert, Benedict Tisa, to support some of this arguments in his response to the motion for summary judgment. *Id.* The City of Sugar Land, the City of Missouri City, and the Individual Defendants filed a motion to limit the testimony of Tisa, arguing that Tisa's opinions are unreliable, and invade the province of the court and jury, and would not assist the jury. Dkt. 38.

## II. LEGAL STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift

to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required. *Id* . "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell* , 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions

of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

### III. ANALYSIS

#### A. Limitations: Individual Defendants

The Individual Defendants move for summary judgment on their claims because they were added as parties after the applicable statute of limitations expired. Dkt. 37. Chadwick does not dispute that he added the Individual Defendants after the expiration of the statute of limitations, but he argues that under Federal Rule of Civil Procedure 15(c), the amendment adding the Individual Defendants should relate back to the original pleading date. Dkt. 41. The Individual Defendants argue that Chadwick has not met his burden under Rule 15(c). Dkt. 46.

Under Rule 15(c)(1):

> An amendment to a pleading relates back to the date of the original pleading when:
> (A) the law that provides the applicable statute of limitations allows relation back;
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>> (I) received such notice of the action that it will not be prejudiced in defending on the merits; and
>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1). Chadwick provides evidence as to when the Individual Defendants allegedly were made aware of the lawsuit filed against the municipalities. Dkt. 41. He then states that the

allegations against the Individual Officers arose from the same conduct described in the original complaint, that the officers are not prejudiced in maintaining their defense, and that they had notice of the lawsuit during the limitations period. *Id.*

What Chadwick does not address is whether there was a mistake concerning the proper party's identity. *See id.* The Fifth Circuit has stated that Rule 15(c) is "meant to allow an amendment changing the name of a party to relate back to the original complaint only if the change is the result of an error, such as a misnomer or misidentification." *Jacobsen v. Osborne*, 133 F.3d 315, 320 (5th Cir. 1998). Chadwick has not identified any mistake in failing to name the Individual Defendants in his original complaint. Dkt. 41. His original complaint is filed simply against the municipalities and does not assert claims against *any* individual officers. Dkt. 1. Thus, this is not a case of simply misnaming the officers.

Additionally, even if Chadwick had identified a mistake in failing to sue the correct defendants during the limitations period, he has not demonstrated that any of these defendants had notice of the case within the limitations period. Chadwick points to testimony that Maxheimer was aware of the claims against the city "[p]rior to being served at [his] home." Dkt. 41, Ex. A at 6. Being aware at some vague point prior to being served with the complaint, when it is clear he was served outside of the limitations period, does not satisfy the requirement that Maxheimer have notice within the limitations period. Yount, similarly, testified that he was aware of a lawsuit filed against the cities at some point before he was sued individually, but he does not state a particular date. Dkt. 41, Ex. B. at 8–9. And Newport stated that he knew about the lawsuit "prior to [his] being added individually" and that he "had been told that it was possibly going to end up going to this, so [he'd] been expecting it; but then later received the verification by mail." Dkt. 41, Ex. C at 6–7. Again,

there is no date as to when Newport knew about the case, just that it was before he got his notice. Chadwick provides no evidence whatsoever about when Boykin learned of the allegations. Dkt. 41.

Because Chadwick has not raised an issue of material fact as to there being a mistake concerning the proper parties' identities, the Individual Defendants' motion for summary judgment is GRANTED.

**B.      Municipal Liability: The City of Stafford**

The City of Stafford argues that no Stafford officer played a part in the decision to enter Chadwick's apartment and none of the officers used force or witnessed force being used against Chadwick, so no municipal liability can attach with regard to Stafford. Dkt. 44. Chadwick does not dispute this contention or offer any evidence implicating the City of Stafford. The City of Stafford's motion for summary judgment is therefore GRANTED.

**C.      Municipal Liability: Unlawful Entry and Excessive Force**

Chadwick argues that the Cities are liable under § 1983 because municipal decisionmakers were personally involved in the alleged constitutional violations. Dkt. 41. The Cities of Missouri City and Sugar Land (hereinafter, collectively, the "Cities") argue first that they cannot be liable because no constitutional deprivation occurred and that, even if a constitutional deprivation did occur, they are not liable because Chadwick cannot meet the elements necessary to hold a municipality liable. Dkt. 37

Section 1983 prohibits "persons" acting under the color of law from depriving another of any "rights, privileges, and immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. Municipalities and cities qualify as persons under § 1983. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690, 98 S. Ct. 2018 (1978). However, municipalities "may not be sued under §1983 for an injury

inflicted solely by its employees or agents." *Id.* at 694. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.*; *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 532 (5th Cir. 1996) ("If a § 1983 suit is brought against a [municipality], the claim must be based upon the implementation or execution of a policy or custom which was officially adopted by that body's officers.") (citing *Krueger v. Reimer*, 66 F.3d 75, 76 (5th Cir. 1995)).

"[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy, and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). A "policymaker" must have "'final policymaking authority' over the subject matter of the offending policy." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702 (1989). "There is no 'de facto' final policymaking authority." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). A "final policymaker" has "final authority to establish municipal policy with respect to the action ordered. . . . [Having] discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482, 106 S. Ct. 1292 (1986).

To meet the "official policy" element, the plaintiff must either allege (1) a written policy or procedure that is officially adopted or promulgated by the policymaking authorities of a governmental agency; or (2) a persistent, widespread practice of governmental agency officials or employees which, although not officially promulgated or adopted, is so common and well settled as to constitute a policy or custom that fairly represents the agency's policy. *Piotrowski*, 237 F.3d at 579. The plaintiff

may also demonstrate an unwritten policy if he or she proves that a "final policymaker" took a single unconstitutional action. *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008).

To meet the "moving force" element, the plaintiff must show direct causation by establishing "'a direct causal link' between the policy and the violation." *Peterson*, 588 F.3d at 848. It is not enough for the plaintiff to allege that a change in policy may have prevented the violation, the municipality's policy "must be affirmatively linked to the constitutional violation." *Faire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992).

Here, there is not sufficient evidence that a municipal policymaker was the moving force behind the alleged constitutional violations. Chadwick contends that the Cities' respective Chiefs of Police or individuals designated as representatives for decisionmaking purposes during an incident were personally involved. Dkt. 41. He does not, however, offer any evidence that there was a written policy that was unconstitutional, a practice that is widespread enough to constitute a policy, or a single action by a *policymaker* that led to the alleged unconstitutional actions. Instead, he asserts that supervising officers knew the circumstances, that a Lieutenant and Captain were on the scene, that the Missouri City Chief of Police was contacted regarding the situation, and that under the MCPD Policy #30-21, the Chief of Police, a command level person, or designated person shall command the operations during a high risk incident, and shall maintain liaison with concerned agencies, gather intelligence, and make command decisions. *Id.* (citing Ex. P).

Chadwick's contention that the supervising officers knew the circumstances does not support his municipal liability claim. The evidence cited for this argument is Newport's deposition. *See* Dkt. 41. When being questioned about whether exigent circumstances were present allowing the officers to enter the apartment, Newport was asked if it was "fair to say that [his] supervising officers knew

these circumstances," and Newport responded in the affirmative. Dkt. 41, Ex. C at 59. This statement indicates simply that the supervisors knew about the entry; it does not create an issue of material fact with regard to whether a final policymaker was the moving force behind the alleged constitutional violation.

First, no reasonable factfinder could conclude that there was a constitutional violation with regard to the entry. While warrantless searches are presumptively unreasonable, a warrant is not required if "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943 (2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393–94, 98 S. Ct. 2408 (1978)). "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* The Fifth Circuit has expressly held that "the threat an individual poses to himself may create an exigency that makes the needs of law enforcement so compelling that a warrantless entry is objectively reasonable under the Fourth Amendment." *Rice v. ReliaStar Life Ins. Co.*, ___ F.3d ___, 2014 WL 5431994, at *6 (5th Cir. Oct. 27, 2014). "The need to protect or preserve life is not limited to instances where violence is directed to another person; the need to protect and preserve life can be just as strong when the violence is directed [at] one's self." *Id.*

Here, Chadwick's friend had informed the police that Chadwick had a gun and may be suicidal. Chadwick asserts that the circumstances were not exigent because four hours had already passed and the Cities had ample time to obtain a warrant. While certainly the amount of time that lapsed between the friend's report of the issue and the actual entrance into the apartment is a concern, it does not rise to a constitutional violation. The police had clearly been attempting to communicate

17

with Chadwick throughout this time period to no avail, and they needed to get into the apartment to make sure he was okay.

Moreover, even if the entry into Chadwick's apartment was unlawful, the fact that the supervisors on the scene knew what was going on in no way indicates that they were policymakers.

Chadwick's contention that a Lieutenant and Captain were on the scene also is insufficient to create an issue of material fact with regard to municipal liability. Simply being on the scene does not mean that these individuals were final policymakers for any of the defendant municipalities or that any policymaking authority was designated to them. Furthermore, Chadwick has presented no evidence that they were the moving force behind the alleged constitutional violations.

Similarly, Chadwick's evidence that the Missouri City Chief of Police was called during the incident fails to raise an issue of material fact with regard to municipal liability. The report submitted indicates that the Chief was called at 9:29 p.m. and "said to have brandon call him/brandon paged." Dkt. 41, Ex. E at 4. A telephone call to the Chief of Police during the early stages of the incident does not indicate that he or she was the moving force behind the alleged constitutional violation. The entry into Chadwick's apartment and alleged use of excessive force did not occur until several hours later, and there is no indication that anything was said by the Chief of Police or any final policymaker that led to the alleged use of excessive force.

Chadwick additionally asserts that the Chief and other higher level decisionmakers were personally involved because they failed to intervene to protect Chadwick's constitutional rights. Dkt. 41 (citing cases from the Second Circuit). Chadwick specifically states that "all law enforcement officers have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers *in their presence*." Dkt. 41 (citing *Anderson v.*

*Branen*, 17 F.3d 552, 557 (2d Cir. 1994)) (emphasis added). Chadwick, however, offers no evidence that any final policymakers were actually present in the apartment when the officers allegedly made the decision to enter, shoot the non-lethal round, and throw the flash grenade, or when the officers allegedly used excessive force against Chadwick. Thus, there is no evidence that a final policymaker failed to intervene to protect Chadwick.[9]

Finally, Chadwick points to MCPD Policy Number 30-21 as evidence that the Cities should be liable. Dkt. 41. The policy indicates that the "Chief of Police, a command level person, or designated person shall have overall command of operations during any high risk incident" and shall, among other things, make "command decisions based on the totality of the circumstances." Dkt. 41, Ex. P. While this policy certainly addresses a delegation of decisionmaking authority during high risk incidents, it does not address policymaking authority. Chadwick has pointed to nothing unconstitutional about this policy on its face, and the policy itself does not demonstrate that final policymakers were the moving force behind the alleged constitutional violations in this case.

**D.      Municipal Liability for Deliberate Indifference with Regard to Training and Supervision**

Chadwick also asserts that the Cities' failure to train, supervise, or discipline amounts to deliberate indifference to his rights and directly resulted in his injuries. Dkt. 41. "The failure to train can amount to a policy if there is a deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement." *Peterson*, 588 F.3d at 849. Similarly, to impose liability for failure to supervise, one must show that the failure to supervise amounts to deliberate indifference. *Goodman v. Harris Cnty.*, 571 F.3d 388,

---

[9] Chadwick also asserts some cases relating to holding a *supervisor* liable; it is unclear how this relates to whether the *municipalities* can be held liable.

395 (5th Cir. 2009). "To demonstrate deliberate indifference, a plaintiff must show that 'in light of the duties assigned to specific officers or employees, [the] need for more or different training [or supervision] is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387, 109 S. Ct. 1197 (1989)). "The failure to train [or supervise] must reflect a 'deliberate' or 'conscious' choice by a municipality." *Id.* (quoting *City of Canton*, 489 U.S. at 389) (internal quotation marks omitted). Usually, plaintiffs must demonstrate "at least a patter of *similar incidents*" in order to demonstrate deliberate indifference. *Estate of Davis ex rel McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) (citations and internal quotations omitted). These prior indications must "point to the specific violation in question"; the "specificity required should not be exaggerated, [but] the prior acts [must] be fairly similar to what ultimately transpired . . . ." *Id.*

The Cities argue that they were not deliberately indifferent to a need for a constitutionally adequate training program. Dkt. 37. And to the extent Chadwick asserts that a single incident exception applies, the Cities point out that there has only been one exception applied in the past thirty years. *Id.* The Cities note that all peace officers in Texas are required to complete hiring, training, and licensing requirements of the Texas Commission on Law Enforcement ("TCOLE") before serving as police officers, and the standards established by TCOLE have been found to comply with constitutional requirements and to be adequate to enable peace officers to deal with usual and recurring situations that peace officers encounter. *Id.* They point out that the State Legislature, via Texas Occupations Code section 1701.253, has mandated that TCOLE establish statewide education

and training programs on civil rights and mental impairments and that compliance with the TCOLE standards exceeds basic constitutional requirements for training. *Id.* According to the Cities, the training the SWAT team members received went above and beyond that required of regular patrol officers. *Id.*

With regard to supervision, the Cities argue that they were not deliberately indifferent to the need for a constitutionally adequate police supervision program. *Id.* They assert that the record establishes that the Cities established a system of hiring, supervising, and disciplining officers in accordance with the requirements of TCOLE. *Id.* The Cities additionally contend that the record contains no evidence that either City had any reason to believe that any of its policies or regulations were deficient or inadequate regarding police supervision and training. *Id.*

Chadwick asserts that the inadequate supervision, training, and disciplinary procedures are evidenced by the Cities' allegedly grossly inadequate response to the welfare check. Dkt. 41. Chadwick also points out that the MCPD After Action Report listed the type of incident as a "Barricaded Armed Subject" even though the facts show that Chadwick was not a barricaded person. Thus, according to Chadwick, this report, which was approved by the MCPD Chief of Police, demonstrates a severe lack of training, oversight, and supervision, and a total disregard for Chadwick's rights. *Id.* Chadwick notes that the report also fails to mention any deficiencies in the operation, equipment, or procedures used, which he states evidences a complete lack of oversight and supervision and indicates that the defendants had an indifferent attitude towards Chadwick's rights. *Id.*

Chadwick's discussion of a MCPD after-the-fact report is not evidence that any of the municipalities failed to train prior to this incident, and Chadwick does not have any evidence of

similar incidents to demonstrate that the Cities are deliberately indifferent to the constitutional rights of citizens. While the court agrees with Chadwick that this incident does not necessarily fit into the "Barricaded Armed Subject" category, since the MCPD Policy at issue defines a Barricaded Armed Subject as being a "person who is reasonably believed to be a threat to inflict bodily injury or death to a hostage or any member of the public or officers, and who is in a stronghold position," the record evidence does indicate that at some point the officers felt that Chadwick was a threat to inflict bodily injury on them (when they thought he had a gun), and it was unclear whether Chadwick was in a stronghold position when he failed to respond to officers. Thus, this report is hardly sufficient to create an issue of material fact as to whether MCPD, or SLPD for that matter, was deliberately indifferent to an obvious need for training or supervision.

**E.      Ratification**

Chadwick contends that the MCPD did not find anything wrong with the actions of its officers, as no disciplinary actions were taken and the Chief of Police expressed no disapproval of the conduct. Dkt. 41. Thus, he asserts that the jury could find that there is sufficient evidence that the final policymakers ratified the events. *Id.* The Cities argue that they did not ratify any unconstitutional conduct. *Id.* They point out that the concept of ratification is only theoretical, and that if the policy relied on is not itself unconstitutional, one would need considerably more proof than the single incident in order to establish both the requisite fault on the part on the municipality and the causal connection between the "policy" and the constitutional deprivation. *Id.* Additionally, ratification of unconstitutional conduct is chargeable only if the authorized policymaker approved of a governmental employee's unconstitutional decision. *Id.*

In *Grandstaff v. City of Borger, Texas*, the Fifth Circuit considered whether the City of Borger, Texas, could be held liable when Borger police officers killed James Grandstaff without due process of the law.[10] *Grandstaff*, 767 F.2d 161, 169 (5th Cir. 1985). The court considered whether there was some policy or custom attributable to the police chief, who was the sole policymaker for the city, that was the cause of Grandstaff's death. *Id.* The jury had found that the city was grossly negligent in failing to properly train its officers, that serious incompetence or misbehavior was widespread throughout the police force, and that the city's consciously indifferent training was the proximate cause of Grandstaff's death. *Id.* at 170. There was no evidence of "prior misconduct within the Borger police force or of prior knowledge of and state of mind of the police chief." *Id.* at 171. The court noted that "isolated instances of police misbehavior are inadequate to prove the knowledge and acquiescence by the city policymaker in that manner of conduct," but that the evidence in the Grandstaff case showed (1) "repeated acts of abuse" by several officers on the night in question, which "tend[ed] to prove a disposition to disregard for human life and safety so prevalent as to be police policy or custom; and (2) that there were "no reprimands, no discharges, and no admissions of error" by the policymaker "[f]ollowing this incompetent and catastrophic

_____

[10] Police were attempting to apprehend Lonnie Cox, whose truck had veered across the street's center stripe. 767 F.2d at 165. Cox had been involved in "some difficulty" earlier in the day, and the police expected to receive a warrant for Cox's arrest. *Id.* Cox would not stop, and a high-speed chase ensued. *Id.* Eventually, this chase included gunfire. *Id.* Cox was wounded and drove through a fence onto the 6666 Ranch. *Id.* There was a house about 275 yards east of where Cox eventually stopped his truck. *Id.* When Cox left his vehicle, there was more gunfire, and one of the police bullets hit the house. *Id.* Grandstaff and his family were in the house. *Id.* Grandstaff was a foreman in charge of part of the ranch. *Id.* Grandstaff saw the police cars and drove his truck down the road to investigate. *Id.* When he heard the police order Cox to come out with his hands up, Grandstaff drove back to his house to warn his family, left a gun with his oldest stepson, and returned to his truck to assist the police. *Id.* Unfortunately, when he approached the patrol cars, the officers opened fire on him. He was able to get out of his truck, but was shot in the back with a high powered rifle. He died before he made it to the hospital. *Id.* Cox surrendered an hour later. *Id.*

performance." *Id.* The court found that if "prior policy had been violated, we would expect to see a different reaction," and that this "reaction to so gross an abuse of the use of deadly weapons says more about the existing disposition of the City's policymaker than would a dozen incidents where individual officers employed excessive force." *Id.* The court thus held that "subsequent acceptance of dangerous recklessness by the policymaker tends to prove his [or her] preexisting disposition and policy." *Id.*

The *Grandstaff* theory of imposing municipal liability for "prevalent recklessness" "has not enjoyed wide application" in the Fifth Circuit. *Snyder v. Trepagnier,* 142 F.3d 791, 797–98 (5th Cir. 1998); *see Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986) ("*Grandstaff.* . . does *not* stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy. Rather, *Grandstaff* affirmed a judgment against a Texas city on a highly peculiar set of facts . . . ."). The Fifth Circuit has instructed that the *Grandstaff* analysis "can be applied only to equally extreme factual situations." *Coon*, 780 F.2d at 1161; *see Snyder*, 142 F.3d at 798–99 (quoting this same language). The Fifth Circuit refused to apply the reasoning in *Snyder*, which involved a suspect who was shot in the back while fleeing on foot following a high-speed chase,[11] and *Coon*, which involved a man who was shot by a deputy after the man fired shots which the police claimed were aimed toward them. *Snyder*, 142 F.3d at 794, 797–98; *Coon*, 780 F.2d at 1159–62. The facts alleged in this case are not as extreme as those in *Grandstaff*. Accordingly, the ratification theory of liability is unavailable.

---

[11] Snyder claimed that he was unarmed and stuck in the mud up to his waist when the officer shot him in the back. *Snyder*, 142 F.3d at 794 & n.1.

Because Chadwick has not provided sufficient evidence of an issue of material fact with regard to any of his theories of municipal liability, the Cities' motion for summary judgment with regard to § 1983 liability is GRANTED.

F.      **Malicious Prosecution**

Chadwick also asserts a claim for malicious criminal prosecution, arguing that the municipalities unreasonably and without probable cause initiated a criminal prosecution against Chadwick even though Chadwick was innocent of the charge. Dkt. 23. Chadwick contends that the municipalities condoned the actions of the officers by allowing the arrest and prosecution to take place, and that he has suffered damages as a result. *Id.*

The Cities assert that there is no evidence to support Chadwick's claim of malicious prosecution. Dkt. 37. They claim that their officers were entitled to detain Chadwick for a mental health evaluation and could use reasonable force to accomplish this under the Texas Health and Safety Code section 570.001. The Cities allege that Chadwick resisted detention in violation of Texas penal laws, which led to criminal charges being filed by the Fort Bend District Attorney's Office. *Id.* The Fort Bend District Attorney's Office is not a defendant. *Id.*

Chadwick, in response, contends that he only must establish that the defendants initiated or procured the prosecution. Dkt. 41. He asserts that Boykin and Yount complained that Chadwick assaulted them even though documents from the incident indicate that none of the SWAT officers were injured. *Id.* (citing Ex. E at 16).

There is no "freestanding constitutional right to be free from malicious prosecution." *Castellano v. Fragozo*, 352 F.3d 939, 945 (5th Cir. 2003). Rather, the claimant must allege a violation of specific constitutional rights connected with the alleged malicious prosecution. *Cuadra*

*v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010). A plaintiff asserting a claim for malicious prosecution under Texas common law, as opposed to federal law, must prove "not only that the defendant commenced criminal proceedings against her and she is innocent of the crime charged, but also that the defendant lacked probable cause and harbored malice toward her." *Kroger Tex. Ltd. P'Ship v. Suberu*, 216 S.W.3d 788, 792 (Tex. 2006). "To prove malicious prosecution, the plaintiff must establish that the defendant caused his [or her] prosecution by either initiating or procuring it." *Hernandez v. Mendoza*, 406 S.W.3d 351, 354–55 (Tex. App.—El Paso 2013, no pet. h.). "A person initiates a criminal prosecution if he [or she] makes a formal charge to law enforcement authorities." *Browning-Ferris Indus. v. Lieck*, 881 S.W.2d 288, 292 (Tex. 1994). "A defendant procures a prosecution when its 'actions were enough to cause the prosecution, and but for [its] actions the prosecution would not have occurred." *Hernandez*, 406 S.W.3d at 355. "A defendant does not procure a criminal prosecution when the decision to prosecute is left to the discretion of another, such as a law enforcement official or a grand jury, unless the defendant knowingly provided false, material information and the false information caused a criminal prosecution." *Id.* "Courts must presume that the defendant acted reasonably and had probable cause to initiate criminal proceedings. . . . To rebut this presumption, the plaintiff must produce evidence that the motives, grounds, beliefs, or other information upon which the defendant acted did not constitute probable cause." *Id.* at 793.

Here, Chadwick has not met his burden or producing evidence to show that any of the named defendants initiated or procured the prosecution. The *only* evidence Chadwick presents in response to the motion to dismiss the malicious prosecution claim is a felony complaint against Chadwick for assault of a public servant and the Missouri City Police call log. Dkt. 41, Exs. E, S. The complaint alleges that Chadwick "intentionally, knowingly, and recklessly cause[d] bodily injury to Matthew

Yount . . . by striking him . . . ."[12]  Dkt. 41, Ex. S.  The call log indicates that there were "no injuries to SWAT officers."  Dkt. 41, Ex. E at 16.  While this could potentially raise a fact issue as to whether the person who caused the charge to be filed had probable cause to believe he or she could prove the injury element, it is not probative in showing that any of the defendants in this case initiated or procured the prosecution.  The motion for summary judgment on the malicious prosecution claim is GRANTED.

**G.      Motion to Exclude Evidence**

The Cities and Boykin, Newport, and Yount move to exclude the testimony of Chadwick's expert, Benedict Tisa.  Dkt. 38.  Since there is not issue of material fact as to Chadwick's claims even if the court considers Tisa's testimony, the court does not reach the motion to exclude.  The motion to exclude Tisa's testimony (Dkt. 38) is DENIED AS MOOT.

---

[12]  The defendants present a charge indicating that Chadwick was charged with "resist arrest search or transport/ma."  Dkt. 36, Ex. R.  The Assistant District Attorney of Fort Bend County, Texas, filed the charge, which asserts that Chadwick intentionally and knowingly prevented or obstructed Yount from effecting an arrest by striking him.  *Id.*  Chadwick, however, provides a completely different charge, so the court presumes his claim for malicious prosecution is based on the assault charge.  If the claim were based on the resisting arrest charge, then the claim would still fail because Chadwick has produced no evidence to overcome the presumption that the defendants acted reasonably in making the charge.

## IV. Conclusion

The motion for summary judgment (Dkt. 34) filed by the City of Stafford is GRANTED. The motion for summary judgment (Dkt. 36) filed by the City of Sugar Land, the City of Missouri City, Boykin, Yount, Newport, and Maxheimer, is GRANTED. The motion to exclude evidence (Dkt. 38) filed by the City of Sugar Land, the City of Missouri City, Boykin, Yount, Newport, and Maxheimer is DENIED AS MOOT. A final judgment will issue concurrently with this order.

Signed at Houston, Texas on November 12, 2014.

_____
Gray H. Miller
United States District Judge